Argued and submitted August 22, 2005, affirmed on appeal;
reversed and remanded on cross-appeal November 15, 2006

In the Matter of the Estate of
Jack David Slusarenko, Deceased.

Ronald J. SLUSARENKO,
Louise Hofer, Patricia D. Shaver,
Donald L. Slusarenko, and Terri J. Eisele,
*Appellants - Cross-Respondents,*

*and*

David SLUSARENKO,
*Plaintiff,*

*v.*

Wilma SLUSARENKO,
*Respondent - Cross-Appellant.*

PR000200, PR010060, CV010443; A123318

147 P3d 920

Larry N. Sokol argued the cause for appellants. With him on the opening brief were Karl G. Anuta and Sokol & Anuta, P.C. With him on the reply brief and response to cross-appeal were Karl G. Anuta, David S. Foster, and Sokol & Anuta, P.C.

Michael B. Collins argued the cause for respondent. With him on the briefs was Collins & Collins.

Before Landau, Presiding Judge, and Ortega, Judge, and Deits, Judge pro tempore.

ORTEGA, J.

## ORTEGA, J.

These consolidated cases involve a dispute over the estate of Jack Slusarenko,[1] and particularly the farm that he owned in Milton-Freewater. To resolve plaintiffs' appeal, we must decide whether a 1998 will and bargain-and-sale deed were the products of undue influence by Wilma Slusarenko, Jack's second wife. To resolve Wilma's cross-appeal, we must decide whether the 1998 will was revoked by operation of law due to Jack and Wilma's remarriage two weeks after the will was executed. Reviewing the record *de novo, Sangster v. Dillard*, 144 Or App 210, 212, 925 P2d 929 (1996), *adh'd to as modified on recons*, 146 Or App 105, 931 P2d 815 (1997), we affirm on the appeal and reverse on the cross-appeal.

Because the record in this case is lengthy and convoluted, we begin with a brief overview. Plaintiffs are all but one of Jack's children from his first marriage. Jack's first wife, Juanita Slusarenko, died in 1986. Jack and Wilma married in 1990, separated and reconciled in 1991, separated again in 1997, divorced in January 1998, and remarried in December 1998. In the latter part of his life, Jack suffered from serious health problems. Between 1986 and 1998, he made five different written estate plans, including a will executed shortly before his remarriage to Wilma in 1998 that left all his property to Wilma. At that same time, Jack signed a bargain-and-sale deed (the 1998 deed) transferring the farm from himself individually to himself and Wilma with a right of survivorship. Jack died in July 2000. After Wilma claimed to be the sole beneficiary of his estate and the sole owner of the farm, litigation ensued.

We turn to a more detailed, chronological examination of the record, beginning with Jack's relationship with his children and his estate plans before he met Wilma. Jack loved his children but had some disputes with them. He was particularly close to his daughter Patricia Shaver, who

---

[1] To avoid confusion, we refer to Wilma Slusarenko, Jack Slusarenko, Juanita Slusarenko, and Jack and Juanita's children—Ronald Slusarenko, Louise Hofer, David Slusarenko, Patricia Shaver, Donald Slusarenko, and Terri Eisele—by their first names. Although all of Jack's children initially were plaintiffs, David Slusarenko is not a party to this appeal.

helped him with Medicare and other issues from the time that Juanita became ill. He described Patricia as being an angel during Juanita's illness and also expressed gratitude for the help of his daughter Terri Eisele around that time. Jack had a sometimes difficult relationship with his son Donald Slusarenko, at times expressing pride and at times complaining. Jack and Donald occasionally argued about the farm, particularly in the late 1980s, when Jack was experiencing financial problems. Jack sometimes expressed frustration with his sons Ronald Slusarenko and David Slusarenko for not calling or visiting more often.

Jack owned three parcels of real property: the "home place," which included the home and about 10 acres of orchard, and two other orchards totaling about 30 acres. He had no written estate plan before 1986, when he executed a will leaving everything to Juanita or, if she predeceased him, to his children. In 1988, after Juanita's death, he executed a will that left 90 percent of his estate to his children and 10 percent to his church.[2]

Plaintiffs testified that, while they were growing up, they constantly worked on the farm; they believe that Jack intended to keep the farm in the family. Despite making comments that support that intention, Jack nevertheless discussed selling his orchards soon after Juanita died. All of the orchards, including the home place, were listed for sale in 1989 and 1990.[3]

Around early 1988, Jack's sister and her husband, Julie and James Overstreet, introduced Jack and Wilma. Jack was 26 years older than Wilma. David acknowledged that, based on what he heard from his siblings, he felt suspicious of Wilma's motives because she was so much younger than Jack and had no financial assets. In April 1988, Jack wrote that he had been sad since Juanita's death, but that he had been spending time with Wilma and she took his mind off

---

[2] Although that will was executed after Juanita's death, it nevertheless stated that all of Jack's estate would go to Juanita or, if she predeceased him, 90 percent of his estate would go to his children and 10 percent to his church. An annotation by Juanita's name indicated that she was deceased.

[3] Jack eventually sold two of the orchards in 1997, retaining only the home place.

his pain. He added that his children "seem to resent me keeping company with her. But [I] think I have my life to live & I'm a lot happier now since I met her."

Jack and Wilma married in March 1990. Jack did not tell his children ahead of time, and tensions soon developed between Wilma and the children. According to Jack's friend Rosa Howton, Wilma did not encourage Jack to be with his family and "seemed to want to keep Jack in a box." After the marriage, Jack spent less time with his daughters, and his relationship with Donald became strained. In 1990, when Donald and Jack had a dispute over the farm finances, Donald told Wilma that the dispute was none of her business, and Wilma responded, "Your dad doesn't need you anymore. He can farm the places without you." Nevertheless, Donald continued farming with Jack into 1991, and Donald continued to help from time to time after that.

Jack and Wilma also had a turbulent relationship. Jack complained to his children and his friends about Wilma's cooking, her failure to get a job or help with the farm work, and her spending. After Jack and Wilma married, the house and yard were extremely dirty and ill-maintained. However, Jack's brother-in-law, Overstreet, who saw Jack and Wilma together once or twice a week, believed that, although their relationship was stormy at times, Jack thought highly of Wilma. Both Overstreet and Wilma's son, Tawin Compton, felt that Jack usually got his way.

In 1991, Jack and Wilma separated after 14 months of marriage. In dissolution proceedings that were filed but not finalized, Wilma sought possession of the house and personal property that Jack claimed as his separate personal property, some of which plaintiffs identified as belonging to their mother. After the children learned of Wilma's claim, their relationship with her worsened. However, Wilma and Jack subsequently reconciled.

After that separation, Wilma was no longer welcome in Patricia's home, although Jack still continued to visit Patricia there, including times when Wilma dropped him off for dinner. Jack told Overstreet that he was upset that his children would not invite Wilma when they invited him to dinner. Wilma generally was not invited to family holiday

gatherings after 1991 or 1992. Conversely, Patricia testified to a belief that Wilma did not consider Jack's children to be part of her own family, and one of Jack's grandsons testified that he did not see his grandfather again after an awkward encounter with Wilma in 1992.

In 1993, Jack and Wilma began meeting with an attorney, Christine Wallace, to discuss estate planning. Wilma made most of the appointments. Jack met with Wallace five to 12 times, including a couple of occasions when he met with her alone. According to Wallace, Wilma wanted the home place, either through a will or a deed creating joint ownership. Wallace felt that Wilma was haranguing Jack and that he was emotionally afraid and trying to pacify her. Jack had concerns about Wilma's finances and did not think that he wanted to leave the house to her. However, he never gave Wallace firm enough direction for her to start putting plans down on paper.

Wilma videotaped one of the meetings, during which Jack expressed various grievances against Juanita and his children, including that his children gave Wilma no respect and felt that she should receive nothing under his will. Wallace advised Jack that, if he died intestate, his estate would be divided, and Wilma would have problems with the children. When Wallace observed that it could be hard to sell the family farm, Jack pointed out that the orchards had been up for sale for several years already. Wallace stated that Jack was not obligated to leave anything to his children and that many people made that choice. Jack expressed agreement and stated that all of his children were paid for their work on the farm. On the tape, Jack does not appear to be intimidated by Wilma.

Around June 1993, Patricia and Wilma had an argument that began when Patricia told Wilma that Wilma needed to do a better job of keeping up the house and yard. Wallace later sent a letter requesting that Patricia and her husband not go into the house unless Jack was home. Jack was concerned about the tension that the situation was creating between Wilma and him, and he and Wallace discussed the best approach to avoid alienating either Patricia or Wilma. After that, Patricia felt unwelcome at the house.

In August 1993, Jack revoked a power of attorney that he had previously given to Patricia and gave that power to Wilma. Wallace felt that Jack believed he needed to make that change in order to keep Wilma happy.

Later, in March 1996, Jack placed his property in the Quiet Hour Trust. He did not consult with Wallace about formation of the trust. Under its terms, Jack's property went to the Quiet Hour, a church organization, with a life estate in the home place to Wilma and $5,000 to each of the children. Wilma videotaped meetings with representatives from the Quiet Hour, and on that tape Jack stated that Patricia had arranged with an attorney to set up his earlier wills and that he had known nothing about the wills before they were presented to him to execute.[4] The trial court found, and we agree, that the tape did not show any signs that Wilma unduly influenced Jack in making his decision to execute the trust.

Throughout that period, Jack had various medical problems. John Hoehn, a doctor specializing in family medicine, treated Jack from 1990 through 1998 and saw him at least 20 times. Jack first saw Hoehn for treatment of shingles and skin problems, but over the years Jack became progressively sicker, with recurring prostate cancer, severe lung disease, and chronic obstructive pulmonary disease or emphysema. Hoehn also treated Wilma and saw Wilma and Jack together many times. Hoehn testified as an expert on behalf of plaintiffs and, ultimately, opined that Wilma pressured Jack to marry her the second time and to provide for her financially.

In February 1997, Wilma told Hoehn that Jack was becoming confused and reversing words and numbers. Hoehn performed an evaluation, sent Jack to a neurologist, and concluded that he had age-related atrophy but was competent. The following month, Hoehn noted arguments between Jack and Wilma, with Jack stating that Wilma said that he was crazy or senile and wanted to use her power of attorney.

---

[4] We interpret Jack's comment about his earlier wills not as a sign that Patricia had exercised undue influence over Jack but as an indication that, when Jack changed his plans, he sometimes disclaimed responsibility for earlier plans.

Shortly after that, Wilma and Jack separated after an argument about money from the sale of certain apples.

From about March 1997 through December 1998, Wilma lived with Marilyn Dale, a woman with whom she became friends. A month after Wilma moved out, Jack asked Hoehn for documentation of his mental capacity, expressing concern that Wilma would try to take over his financial affairs. Over the next three months, Jack related various concerns to Hoehn: financial problems, worries that Wilma was taking funds from their joint account and running up large bills, and fears that Wilma was interested only in financial security. Jack told Hoehn that he loved Wilma but wanted to separate himself from her financially.

Jack filed for dissolution in May 1997. Wilma was unrepresented. During the divorce proceedings, Jack sought an order restraining Wilma from entering the home without his permission, and he lived there alone until November 1998. Immediately after Wilma moved out, Jack asked Patricia and others to clean up the house, which was in a filthy condition, with maggots in the laundry room, soiled underwear and rotting food under the bed, and sacks of garbage in the kitchen.

Shortly before filing for dissolution, Jack revoked the Quiet Hour Trust; he informed Wallace and Patricia that the trust had been Wilma's idea. Jack also revoked the power of attorney that he had given Wilma and gave that power to Patricia and Donald. He then executed a will (the 1997 will) leaving all of his property to his children, and established a family trust so that, if he died during the pendency of the dissolution, his estate would not be subject to a spousal elective share. Because Wilma filed a Bar complaint against Wallace (which was later dismissed), Wallace ceased representing Jack around July 1997 and had no significant contact with him after that time.

Patricia testified about an occasion, possibly after Jack and Wilma's divorce, when Jack arrived at Patricia's house late at night appearing drunk or dizzy and said that Wilma had given him some medicine. He then gave Patricia the deed to the house and some other documents. Jack apparently expressed concern about being drugged by Wilma only on that one occasion. He had a prescription for a sleeping aid

that later caused him to experience hallucinations, although it is unclear whether that medication was related to his condition on the night that Patricia described.

Jack and Wilma apparently began discussing reconciliation soon after they separated. In a note dated May 1997, Wilma stated that, before she would make any changes in her living arrangements, she wanted her name to be added to the deed to the property where she lived and to Jack's financial accounts. Jack wrote "no" on the note.

In October 1997, Wilma accompanied Jack to an appointment with Hoehn, who observed that the two appeared to enjoy being together but continued to argue. Wilma accompanied Jack to another appointment in December and silently left the room when Jack mentioned that he was worried about the dissolution. Hoehn thought that Jack "want[ed] to manipulate Wilma back into living with him. Wilma [did] not want to come back without certain financial understandings." At times, Jack appeared to use the threat of divorce to try to get his way. Hoehn's perception was that both were needy and that their relationship was stormy and often caused them stress.

Hoehn thought that, almost all of the time, "the concern that Wilma would express was that she was financially unstable and didn't have enough money. Jack would express that he needed care and somebody to help him, but he was worried that she was taking too much of his money." Hoehn felt that each of them was trying to get individual needs met: "Wilma was providing a service that Jack found valuable, and he appreciated what she did for him, and he was distressed when he lost those services." Wilma actively helped care for Jack, giving him his pills on time and taking him to medical appointments. Wilma continued to assist Jack during the time they were divorced, although Patricia also took Jack to appointments with Hoehn.

Dale testified that, in December 1997, Wilma was upset about Jack's statements about her to his family and others. Around that time, Wilma sent Jack letters in which she asserted that his behavior toward her was sinful and quoted passages of the Bible that she interpreted as warnings against his behavior. In one letter she wrote, "If you do not stop this evil situation, you have let your self become a

part of, then God will soon step in." In another letter she accused him of cruelty to her. Howton testified that Jack was very hurt by such comments.

Wilma did not appear at the December 1997 dissolution trial, and the marriage was dissolved in January 1998. Wilma was awarded her personal property from before the marriage and some personal property that was in her possession. Patricia and her husband testified that Jack was happy after the divorce, although Patricia acknowledged that Jack was still attached to Wilma, even during the dissolution proceedings. Patricia believed that, although Jack was mentally competent, he was very dependent on Wilma. After the divorce, Patricia sometimes observed Jack becoming upset on occasions when Wilma called him and asked for things such as money or new tires. Jack also told Patricia that Wilma took things from the house when she came over at his request to rub his feet.

After the dissolution was final, however, Jack pursued a relationship with Wilma, even when she was reluctant to see him. Overstreet testified:

> "He told me that he was going to do his best to get Wilma to come back to him, and I said, Jack, you just spent a lot of money to get a divorce because it seemed like you guys were fighting a lot, so why not leave Wilma alone. He said, You haven't lived alone, Jim. He said, The other night, I fell. If I would have hit my head, I would have bled to death and anybody would have never found me. I'm scared to live by myself."

Jack visited Wilma at Dale's house, eventually coming over almost every day. Although Jack and Wilma sometimes argued over the telephone, Dale observed that their face-to-face interactions were positive, gentle, and kind. She thought that there was affection between them and that Jack was pursuing Wilma. Another friend who often visited Wilma testified that Jack was always there and that Jack and Wilma looked happy together.

During that period when Wilma was living with Dale, Wilma's son, Compton, saw that Jack was visiting, and Wilma told him that Jack wanted to get remarried. Compton opposed the idea because he thought that Wilma was left in a

difficult position during and after the divorce, when she could not afford to hire an attorney. He also thought that, if Jack and Wilma were to remarry, she needed some kind of understanding first. He advised Wilma to "get something in writing before she ever got married."

Richard Felt, a doctor specializing in pulmonary critical care and internal medicine, began treating Jack in late May 1998 and continued seeing him regularly until Jack's death in July 2000. Wilma usually accompanied Jack to his appointments, and Felt thought that she was supportive of Jack and demonstrated a positive, caring attitude. Jack always was able to relate his own symptoms and history independently and spontaneously.

In July 1998, Hoehn had an appointment with Wilma and Jack that turned into a counseling session. Hoehn suggested that they could establish a business relationship in which Jack would pay Wilma to provide him with help. Hoehn felt that both Jack and Wilma were able to hold their own positions during that meeting. Hoehn thought at that time that remarriage "was on the table, and [he] didn't think it was a good idea."

In mid-October, Jack and Wilma made an appointment to see an attorney, David Gallaher. However, when they went in for the appointment, they left without seeing Gallaher because Jack thought that his fees were too high.

In November and December 1998, Jack was hospitalized on two occasions. On November 4, Jack's lung collapsed, and he was hospitalized until November 12. At the same time, he suffered complications with pneumonia and was disoriented and hallucinating because of side effects from his medication. His pain medications and sleeping pills had to be stopped, and he was switched to a sleeping pill that he tolerated better. The November hospitalization was the first time that Hoehn had seen Jack become completely incompetent. However, by the time Jack left the hospital on November 12, he had improved and was responsive. Felt believed that Jack was able to manage his own affairs in November and December 1998, when he made the changes to his estate plan that are at issue here.

Floyd Arnold was the hospital chaplain and saw Jack often that November and December, as well as during later hospitalizations in 1999 and 2000, and he later presided at Jack's funeral at Jack's request. Arnold thought that, except for the period that Jack was disoriented by a reaction to drugs, Jack was mentally sharp, with a subtle wit. Arnold never saw Wilma behave in a controlling manner, nor did he think that Jack ever appeared afraid. He observed that Wilma was a help to Jack and was there for him constantly.

Patricia learned indirectly about the November hospitalization, and later she met Jack and Wilma on the road. She told Jack that she had been concerned that she did not know where he had been, and he responded that he did not want to bother his children. Patricia and Jack had previously discussed that, when he was sick or needed help, he should contact one of the children. When Patricia asserted that it was Jack's or Wilma's responsibility to let the children know when Jack was sick, Wilma became angry and drove off quickly. Wilma testified that Patricia accused Wilma of keeping Jack from her; Wilma acknowledged becoming angry and cursing.

Jack lived with Wilma at Dale's house after the November hospitalization; Dale thought that Jack would have preferred to have Wilma live with him at his house, but Wilma was not willing to move there. Dale thought that Jack's mental ability was fine and that his personality was unchanged; he still seemed to be a person of strong opinions who was not dominated or controlled by Wilma. Donald talked with Jack on the telephone during that time period but felt that he was not welcome to visit Jack at Dale's. Compton also saw Wilma and Jack together, and he thought that Jack appeared unafraid, mentally alert, and independent. He talked with Jack during Thanksgiving about Jack and Wilma's plans to remarry.

On November 18, Jack and Wilma returned to Gallaher's office. Gallaher's 13 years of private practice included a good deal of estate planning and work on many mental commitment cases. When Gallaher realized that Jack wanted to talk about a will, he explained that he would be representing Jack and that he needed to speak with Jack

alone. Gallaher met with Jack for a little over half an hour on the first visit and had five or six total meetings with him in November and December. Although Wilma came along to the meetings, Gallaher preferred to talk with Jack alone.

At follow-up visits with Hoehn on November 20 and 25, Jack was oriented, aware, and responsive. Hoehn testified to his assessment that, throughout November and December, Jack "was in a fairly tenuous condition, and I was concerned at every visit whether he was confused or not, because he was on the border." Hoehn noted on November 25 that Jack was in good spirits.

On November 24 and December 2, Gallaher and Jack discussed the possibility of a contract to make a will, which would provide Wilma with the additional assurances she wanted that Jack could not easily revoke any promise to provide for her by will. Jack was doing the talking from the beginning, although he seemed to have some physical frailties. Gallaher knew of some but not all of Jack's health problems and did not recall at trial the specific times that Jack had been hospitalized. Gallaher did not see cause for concern about Jack's mental capacity, nor did he think that Jack appeared afraid of or intimidated by Wilma. Gallaher felt that Jack was in control of the situation and that Wilma was dragging her feet. Indeed, Gallaher thought that Jack "may have allowed Wilma to think that she was in charge—was my impression of Jack—when, in fact, he knew what he was doing and he was getting what he wanted, which was somebody to take care of him."

Gallaher was alert to the concern about potential undue influence and talked with Jack alone to be sure that the will was what he wanted. Gallaher testified that Jack loved and had no ill will toward his children but wanted to use his assets to ensure that he would be taken care of. Jack told Gallaher that his children were successful, implying, without expressly stating, that the children did not need an inheritance. Jack did not want to tell his children about the change in his estate plan until it was done, and Gallaher felt that he made that decision independently of any influence by Wilma. Although there was no pressure to do so, Gallaher

was able to get the documents prepared fairly quickly after about two hours of consultations with Jack.

Jack wanted Wilma to take care of him and, in exchange, he would deed to her an interest in the home place and then leave everything else to her by will. When Gallaher explained the consequences of putting Wilma's name on deeds or accounts, Jack "understood that, and, essentially, on more than one occasion, he said, Give her whatever she wants, whatever it took to get her to take care of him." Gallaher thought that Jack had reached a rational decision on his own, because Jack felt that Wilma could take care of him and he did not want to go to a nursing home. Indeed, Patricia also testified that, after Juanita's death, Jack consistently said that he did not want to go to a nursing home.

Wilma testified that, when she and Jack reconciled, she wanted financial protections and had concerns about trusting Jack; she felt that he had not kept his word to her before and that he had said false things about her to his children. Wilma prepared a written list of "[t]hings I would like to have happen if Jack and I get back together." On December 1, Jack wrote, "I've read Wilma's wants & demands & hope I can please her as much as possible." Wilma also testified that she did not know that, in the 1998 will, Jack was leaving nothing to his children. We agree with the trial court that Wilma's testimony about her ignorance of the contents of the 1998 will was not credible.

At a meeting with Wilma and Jack on December 2, Gallaher explained to Wilma that, pursuant to the contemplated contract to make a will, if she took care of Jack, she would inherit his property. Wilma did not say that she could not perform any specific tasks, such as cooking and sewing, that were required by the contract to make a will, but she did say that she had health issues and concerns about her ability to do everything that Jack wanted. Jack, who was present when Wilma expressed those doubts, did not seem concerned with the specific tasks so long as Wilma would take care of him.

On December 9, Gallaher obtained a fairly detailed personal history from Jack to ensure that Jack knew what he

was doing. That same day, Jack signed the 1998 deed conveying an interest in the home place to Wilma and revoked the family trust that he had set up at the time of the divorce. Although he did not sign the contract to make a will until a week later so that changes could be made at Wilma's request, Jack did sign the will on December 9, along with the other documents.

On December 12, Jack again suffered a collapsed lung and was hospitalized until December 16. Hoehn saw Jack every day during the December hospitalization. Jack was constantly on oxygen during November and December 1998, and Hoehn felt that Jack was weak and vulnerable during that time period. In a note concerning the December hospital admission, Hoehn stated that Jack and Wilma "had a bit of a stormy relationship and divorce, but now they are pretty much together most of the time as former husband and wife. They seem to have a better relationship now than they have had some time in the past." During November and December, Hoehn "didn't see the same sort of mutual manipulation" that he had previously seen in Jack and Wilma's relationship.

On December 15, Wilma provided Gallaher with information regarding changes that she wanted in the draft of the contract to make a will. Gallaher prepared revisions to the contract and, the next day, took that document to Jack in the hospital, where he signed it. Although Jack's physical condition was not good, he still appeared to Gallaher to know what he was doing.

In the 1998 will, Jack left all of his property to Wilma or, if she predeceased him, to his church. Gallaher understood that Jack wished to "get[ ] back together with" Wilma and "wanted to make a deal with her" to provide the care that he needed. Gallaher knew that they were discussing remarriage but did not see that as the major factor in their deal:

> "[Gallaher:]  They had discussed getting remarried and that Wilma was essentially adamant that she would not do that without some protections. She had felt that having apparently learned that marriage of itself is not necessarily a protection in the event of a divorce, she was—I don't know

where—I don't know what information she'd had prior about contracts to make wills, but she wanted more than just being married.

"[Wilma's attorney:]   So the discussion was along the lines of Jack wanted Wilma to come back and live with him and marry him?

"[Gallaher:]   Yes, although I—yes, that's correct. The marriage part wasn't a big item, as I recall. It was just—and that's just my recollection * * *. The main thing was he wanted somebody there to take care of him."

Although Jack and Wilma had discussed remarriage, Gallaher's focus in drafting the documents was not on the marriage.

Jack and Wilma did not obtain a marriage license until after all of the documents pertaining to the will were executed. Wilma testified that Jack was still in the hospital when the documents were signed but that they got married as soon after that as possible. On December 22, Jack and Wilma remarried.

When Hoehn saw Jack earlier that same day, Jack was slowly improving from his serious illness and appeared alert and aware. He did not tell Hoehn that he was getting married. Hoehn did not treat Jack again after December 1998.

Gallaher also saw Jack and Wilma on December 22 and thought that Jack seemed happy about the prospect of getting married. According to Gallaher, Wilma was concerned that Jack's children did not like her (which Jack acknowledged) and would influence Jack against her; Jack stated that he had probably been overly influenced by his children during the dissolution.

Jack did not tell his children about the wedding until after it happened. Patricia acknowledged that Jack probably knew that she would disapprove. Patricia thought that, when Jack and Wilma reconciled in 1998, Jack was capable of thinking but was very sick and lonesome. Terri also felt upset by the remarriage but understood that Jack was lonely and wanted Wilma's company.

Gallaher testified that Jack told him to contact the children only after everything was done. In late December, then, Patricia received a letter from Gallaher stating that Jack had revoked the family trust and the power of attorney that he had given her and had remarried Wilma. The letter stated, in part, "As you would expect, Jack's doctors emphasize the need for no undue stress in Jack and Wilma's life right now. It is Jack's hope that you will convey this message to the rest of the family and that any contacts with Jack and Wilma be of an amiable and understanding nature."

Jack talked with Overstreet about promising to leave everything to Wilma in exchange for her taking care of him. Overstreet thought that Jack knew what he was doing and that Wilma was not forcing him to do anything. He also thought that Jack seemed happier and more carefree after the remarriage.

Wilma could not keep up with the housekeeping that she had agreed to do, so she hired people to help with the housekeeping starting in May 1999. A hospice worker, Amy Katsel, who helped care for Jack for six to eight weeks in the summer of 2000, shortly before his death, testified that the house was filthy when she arrived and that she did not observe Wilma doing housework or significant cooking. To Katsel's knowledge, however, Wilma was providing all of the rest of Jack's care. The hospice patient care coordinator addressed problems with Wilma's asking hospice staff to do more housework than was appropriate, but Jack's hospice file indicated that he had received adequate care.

Charles Walker, a chaplain with the hospice program, saw Jack about five or six times in 2000, usually for 30- to 45-minute visits. Jack was awake for only two or three of the visits; Walker did not want to wake him. At one time, Wilma talked with Walker about arrangements for Jack to provide her a place to live after he died. When Wilma asked Jack if what she said was correct, he said yes.

After the remarriage, Jack had at least some contact, without Wilma present, with Patricia, Donald, and his sister Olga. Jack's complaints about Wilma largely dissipated, although he voiced some complaints to Donald and Louise. Overstreet and Compton visited Jack often, and both

felt that Wilma took good care of him and that Jack was happy.

In two instances, Wilma excluded Jack's children from receiving information from Jack's health care providers. Felt's October 1999 notes indicated that Wilma "wants no info given to [Jack's] family. She wants a mental status done to prove he's competent." Wilma claimed that Jack told her to do so. On the forms for hospice, Wilma listed her son as Jack's next of kin and did not list any of Jack's children, although a hospice employee later noted Patricia's contact information on the form.

During Jack's final illness, however, Wilma did not hamper Patricia's visits, and Wilma called Patricia when it appeared that Jack was about to die. During the last month of Jack's life, Patricia visited him several times per week. Wilma also took Jack to Terri's house for a high school graduation party. Wilma and Jack visited Ronald in Portland a few times during the last years of Jack's life, and their relationship appeared companionable during those visits.

After Jack died in July 2000, Wilma sought to enforce the 1998 will. In response, plaintiffs argued, *inter alia*, that the 1998 will was invalid because of subsequent marriage, testamentary incapacity, and undue influence. In a separate action, plaintiffs sought declarations invalidating the 1998 deed and the contract to make a will; they alleged that the deed and contract were invalid because of undue influence, lack of capacity, and misrepresentations by Wilma. Two of the plaintiffs also sought to have the 1997 will admitted to probate; they contested the 1998 will, which they claimed was invalid because of subsequent marriage, lack of testamentary capacity, undue influence, and fraud.

The trial court consolidated the cases and later bifurcated issues for trial, addressing issues of undue influence and competency first. The court found that Jack was competent and that he chose to trade his assets for Wilma's care and "made that choice intelligently, knowingly and * * * without undue influence." After finding for Wilma on those issues and rejecting plaintiffs' claims that the 1998 will and deed were invalid because of lack of capacity, undue

influence, or fraud, the court found that the 1998 will never-theless was voided by subsequent marriage and that Jack died intestate. The trial court accordingly entered limited judgments that dismissed with prejudice plaintiffs' requests that the will, the trust revocation, the contract to make a will, and the deed be declared invalid on the basis of incapacity or undue influence. ORS 111.275. The trial court determined that the 1998 will was revoked by operation of law as a result of Jack and Wilma's subsequent remarriage, but denied plaintiffs' other grounds for contesting that will. The trial court also determined that Wilma had not made any claim for enforcement of the contract to make a will and that, in any event, she did not perform her obligations under that con-tract. Thus, under the trial court's judgments, Wilma owns the home place pursuant to the 1998 deed, and the remainder of Jack's estate is to be divided between Wilma and the chil-dren pursuant to the intestacy statutes.

On appeal, plaintiffs assign error to the trial court's ruling that the 1998 will and deed were not products of undue influence.[5] Wilma cross-appeals, assigning error to the ruling that the will was invalidated by the subsequent marriage. We consider each assignment of error in turn.[6]

Plaintiffs first contend that Wilma exerted undue influence over Jack when he executed the 1998 will and deed. Undue influence "has been characterized as 'a species of fraud' " involving a beneficiary's reaping unfair advantage from wrongful conduct. *In re Reddaway's Estate*, 214 Or 410, 419, 420, 329 P2d 886 (1958). As the court explained, "every will is the product of some kind of influence. It is the task of the courts to determine whether the influence in the partic-ular case is 'undue.' " *Id.* at 418 (citation omitted). The emphasis in such cases is on the conduct of the person alleg-edly exercising undue influence and whether that person

---

[5] Plaintiffs do not assign error to the rejection of their argument that Jack lacked capacity in 1998. Although they argue in passing that the "trust revocation documents should also or alternatively have been voided for undue influence," they do not assign error to any ruling concerning the revocation of the family trust. Accordingly, we do not consider that issue.

[6] Regardless of our disposition of the cross-appeal, we would have to address the undue influence issues to resolve the appeal regarding the deed. Accordingly, we address the issues in the same order that the trial court did.

"gained an unfair advantage by devices which reasonable [people] regard as improper[.]" *Id.* at 419. The same test for undue influence applies to wills and deeds, although the absence of independent advice may be more significant in the case of deeds than wills. *Ryan v. Colombo,* 77 Or App 71, 77, 712 P2d 139 (1985) (citations omitted).

■ In such cases, the first question is whether there was a confidential relationship, in which the testator placed confidence in the beneficiary and the beneficiary exercised dominance over the testator. *Knutsen v. Krippendorf,* 124 Or App 299, 308, 862 P2d 509 (1993), *rev den,* 318 Or 381 (1994). Plaintiffs contend that, given Wilma's role in administering Jack's medication and taking him to medical appointments, among other factors, there was a confidential relationship. *See In re Reddaway's Estate,* 214 Or at 421 (recognizing that a caregiver and patient relationship may be confidential); *Ramsey v. Taylor,* 166 Or App 241, 262-63, 999 P2d 1178, *rev den,* 331 Or 244 (2000) (finding a confidential relationship under similar circumstances). Although Wilma emphasizes Gallaher's testimony that Jack appeared to be the dominant person in their relationship and Hoehn's testimony that he did not observe manipulative behavior around the time that the 1998 will and deed were executed, she does not seriously dispute that a confidential relationship existed. Because Jack was living with Wilma and relying on her to manage his medications and doctor's appointments, we conclude that theirs was a confidential relationship. *See Knutsen,* 124 Or App at 309 ("Dominance can be expressed * * * subtly, such as by suggestion or persuasion or by fostering a sense of need and dependence.").

■ When a confidential relationship exists, we consider whether suspicious circumstances were present. If the will contestant presents slight evidence of suspicious circumstances, then a presumption of undue influence arises, and the beneficiary must come forward with evidence to rebut the presumption. *In re Reddaway's Estate,* 214 Or at 420. The following factors may constitute suspicious circumstances: (1) the participation of the beneficiary in the preparation of the will; (2) a lack of independent and disinterested advice; (3) secrecy and haste in the preparation of the will; (4) an unexplained change in the testator's attitude toward others; (5) a change in the testator's estate plan; (6) an unnatural or

unfair disposition of property; and (7) the testator's susceptibility to undue influence. *Id.* at 421-27. We also examine "the consequences of upholding the influenced gift." *Id.* at 419. For example, "[i]t would be expected that there would be less concern with the influencer's motive in a contest between him and the state claiming by escheat than there would be in a contest between him and the donor's deserving spouse." *Id.*

Plaintiffs contend that multiple suspicious circumstances were present in the execution of the 1998 will and deed: that Wilma participated in preparation of the documents, that the documents were prepared in secrecy and haste, that there was an unexplained change in Jack's attitude toward his children, that there was a change in prior plans, that there was an unnatural or unjust gift, and that Jack was susceptible to undue influence.

We conclude that some, but not all, of those circumstances were present. Wilma did participate in the making of the will and the deed, making specific demands in those regards. There also was some degree of secrecy: Jack instructed Gallaher not to tell Jack's children until his plans were complete. Jack deviated from his previous plans: the 1998 will marks the first time that Jack made no testamentary provision whatsoever for his children. Even if Jack had wished to treat Wilma as he did Juanita in his 1986 will, that earlier will made gifts to Jack's children if Juanita predeceased him; there was no such provision in the 1998 will. As to the deed, by putting the orchards and the home place up for sale before, Jack demonstrated that he did not necessarily intend to pass on the farm to his children; however, he previously had been unwilling to give Wilma an ownership interest. Finally, because of medical problems, Jack was susceptible to influence in November and December 1998. During that period, he suffered from serious illnesses and was very concerned about living alone.[7]

---

[7] The other factors, however, were not present. Jack received independent advice from Gallaher. Although Gallaher happened to have time to prepare the documents quickly, there was no pressure for haste. Jack's attitude toward his children did not change. Although Wilma sometimes discouraged visits or limited information from health care providers, Jack's family and friends continued to see him and sometimes saw him alone. *See Ramsey*, 166 Or App at 266 (the beneficiary did not isolate the decedent where, although there were disagreements, family members had time to be alone with the decedent, and the beneficiary facilitated visits by a friend and family member). In light of Jack and Wilma's relationship

Because some suspicious circumstances were present, we examine whether sufficient evidence was present to overcome the inference of undue influence. *Ramsey*, 166 Or App at 270. Here, we conclude that there was, because the suspicious circumstances are accounted for by Jack's desire to have Wilma take care of him for the rest of his life.

Both Wilma's participation in the preparation of the will and deed and Jack's deviation from his earlier estate plans were the result of a bargaining process between Wilma and Jack. Hoehn observed Jack and Wilma bargaining about their respective needs and potential reconciliation during and after the dissolution of their first marriage, with Jack trying to get Wilma back and Wilma insisting that they first reach some financial understandings. That view of the bargaining between Jack and Wilma is borne out by the testimony of Gallaher, who thought that Jack was making a decision to trade his assets in exchange for Wilma's care and that Jack knew what he was doing. We further note that the effect of Wilma's participation in the preparation of the 1998 will and deed was lessened by Jack's obtaining independent advice from Gallaher. *See Ryan*, 77 Or App at 80 (noting that independent advice is an important factor in evaluating the effect of a beneficiary's participation in the transaction).

Although there was some secrecy, Jack was not entirely secretive about his plans. He talked with Overstreet about his estate plans and had opportunities to talk with his children alone, if he wished to do so. *Cf. In re Reddaway's Estate*, 214 Or at 423 (finding secrecy where the beneficiary, his wife, and his mother-in-law were the only ones who knew of the change in the testator's plans and the mother-in-law discouraged people from visiting the testator and kept a watchful eye when people did visit). Moreover, the initial secrecy was Jack's choice, a result of his understanding that his children would not approve of his reunion with Wilma. In any event, after Gallaher wrote to Patricia in late December 1998 about the revocation of the family trust, Patricia was aware that Jack's estate plans had likely changed.

and discussion of remarriage, the will and deed are not an unnatural gift. Their relationship had improved, and Jack wished Wilma to care for him.

Jack's susceptibility to influence is troubling. However, Jack began to pursue reconciliation with Wilma long before he was hospitalized in November and December 1998. Hoehn counseled them about their relationship and was aware that they were considering reconciling as early as July 1998. The initial appointment with Gallaher to discuss estate planning also was made before Jack's hospitalizations, and Gallaher, meeting with Jack alone, observed that Jack appeared to be in control of his situation.

By the time that Jack executed the 1998 will and deed, he had known Wilma about a decade. Their relationship had been stormy. However, after going through with the dissolution of his marriage to Wilma, Jack tried to reunite with her for months before he became ill and required hospitalization. Witnesses who saw them together after the dissolution believed that their relationship had improved. Jack knew Wilma well and chose to give her the financial promises that she had long desired in exchange for her returning to him and taking care of him. Despite conflicts between Wilma and Jack's children and Wilma's occasional interference with the children's access to Jack, he continued to see his children, as well as other family and friends, and was not isolated. He received independent legal advice regarding the deed and will, and his lawyer and doctor seem to agree that Jack sometimes manipulated Wilma. After he executed the will and deed, he lived with Wilma for one and one-half years and appeared to be fairly content; he did not try to rearrange his finances after executing the will. In short, Jack's disposition of his property was a result of his choices regarding the care that he wanted to receive at the end of his life, not wrongful conduct by Wilma. We accordingly affirm the trial court's rejection of plaintiff's undue influence claims.

■ On cross-appeal, Wilma contends that the trial court erred by holding that the 1998 will was revoked by Jack and Wilma's subsequent remarriage. ORS 112.305 provides, in pertinent part:

"A will is revoked by the subsequent marriage of the testator if the testator is survived by a spouse, unless:

"(1)   The will evidences an intent that it not be revoked by the subsequent marriage or was drafted under circumstances establishing that it was in contemplation of the marriage[.]"

Wilma contends that the will was drafted in contemplation of marriage and thus falls within that exception to revocation by marriage. Plaintiffs respond that the will was drafted as a result of Jack's fears and Wilma's desire for property, not in reliance on or in contemplation of marriage.

Under the familiar methodology of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993), when we construe statutes, we attempt to determine the legislature's intent by examining the statute's text and its context. If the statute is unambiguous, we stop at that first level of analysis. *Id.* at 611. "Contemplation," in this context, commonly means "the act of looking forward to an event : the act of intending or considering a future event : EXPECTATION ‹a shooting match . . . and other sports were in ~ — S.E. White›." *Webster's Third New Int'l Dictionary* 491 (unabridged ed 2002). We thus consider whether the circumstances establish that Jack was looking forward to, intending, or considering remarriage to Wilma when the will was drafted. In our review of the evidence concerning the remarriage, we disregard Wilma's testimony on the issue; the trial court found, and we agree, that her testimony was not credible in some respects. Nevertheless, we conclude that other evidence in the record establishes that Jack, at the time the will was drafted, was acting in contemplation of remarriage to Wilma.

Jack and Wilma began discussing remarriage well before Jack executed the 1998 will. In December 1997, before the first marriage was dissolved, Hoehn noted that Jack wanted Wilma to return to him and was using the threat of the dissolution to get his way, while Wilma wanted financial understandings in place before she returned. In early 1998, Compton advised Wilma that before remarrying Jack, as Jack wished, she should do "[s]omething to protect her rights." In July 1998, Hoehn observed that Jack and Wilma were considering remarriage, and he encouraged them to enter into some sort of business relationship instead. During

Thanksgiving of that year, Compton and Jack discussed Jack and Wilma's plans to remarry. In discussions with Gallaher, Jack focused on ensuring that Wilma would care for him and did not ask Gallaher to draft the will as being contingent on marriage. Nevertheless, Gallaher testified that Jack and Wilma had discussed getting remarried and that Wilma "was essentially adamant that she would not do that without some protections." Gallaher thought that Jack "seemed happy about that prospect of getting married. He seemed, you know—I think that he was, in essence, getting his way."

Hoehn's and Compton's testimony indicates that Jack pursued Wilma and that the impediment to their reunion was their prolonged negotiations over financial issues. Wilma's bargaining with Jack concerning the contract to make a will and the 1998 deed, as observed by Gallaher, is consistent with Compton's advice that Wilma have a written understanding with Jack before they remarried.

Jack and Wilma married promptly after they reached some financial understandings. Jack signed all of the documents except the contract to make a will on December 9, and executed the contract a week later. Jack and Wilma remarried on December 22. Given those circumstances, we conclude that the 1998 will was drafted in contemplation of marriage and thus was not revoked by Jack and Wilma's subsequent remarriage. Accordingly, we reverse the trial court's decision that the 1998 will was revoked by subsequent marriage.

Affirmed on appeal; reversed and remanded on cross-appeal.